UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| OPERATION: HEROES, LTD.,<br><br>                              Plaintiff,<br><br>    v.<br><br>PROCTER AND GAMBLE<br>PRODUCTIONS, INC. et al.,<br><br>                              Defendants, | Case No. 2:12-cv-00214-MMD-GWF<br><br>ORDER<br><br>(Defendants' Motion to Transfer Venue to<br>the United States District Court for the<br>Southern District of Ohio, Western Division<br>– dkt. no. 31)<br><br>(Defendant Procter & Gamble Productions,<br>Inc.'s Motion to Compel Arbitration and<br>Motion to Stay – dkt. no. 32) |

Before the Court are Defendants Procter & Gamble Productions, Inc. ("Productions"), The Procter & Gamble Company ("Company") (collectively, the "P & G Defendants"), and TeleNext Media, Inc.'s ("TeleNext") Motion to Transfer Venue to the United States District Court for the Southern District of Ohio, Western Division (dkt. no. 31), and Defendant Productions' Motion to Compel Arbitration and Stay Proceedings (dkt. no. 32). For the reasons discussed below, the Motion to Transfer (dkt. no. 31) is denied and the Motion to Compel Arbitration is granted. Defendant Productions' Motion to Stay (dkt. no. 32) is granted in part and denied in part, as described below.

## I.    BACKGROUND

Plaintiff Operation: Heroes created and developed the idea for an awards show entitled "Operation: Heroes." (Dkt. no. 25 at ¶ 8.) The show was initially planned to take

1   place in Las Vegas, Nevada, and would recognize and award members of the American

2   military, police force, and firefighter units for "acts of valor committed in the line of duty."

3   (Dkt. no. 38 at 4.)   Columbia Broadcasting System ("CBS") agreed to televise the

4   Awards Show.  Plaintiff planned for celebrity vocalist Wayne Newton to host/emcee the

5   event, and for several other celebrities to present during the ceremony.  (Dkt. no. 25 at ¶

6   9.)  The plan was to produce a live, two-hour prime-time television special over Memorial

7   Day weekend 2010.  (*Id.* at ¶ 8.)  This broadcast was to be followed by a national media

8   bus tour, the production of a television documentary, as well as sales of event-related

9   merchandise.  (*Id.*)  Plaintiff's intent was to make the Awards Show and subsequent

10   related events an annual event.  (*Id.*)

11         Plaintiff, through its principal R.C. Foster, contacted Company in August 2009

12   regarding the possibility of sponsoring Operation: Heroes.  Company directed Plaintiff to

13   its production company, Productions, and informed Plaintiff that Productions would

14   consider its proposal.  Representatives from Productions and Plaintiff met on or about

15   August 25-26, 2009, in Las Vegas, Nevada regarding the proposal.  (Dkt. no. 38-1 at ¶

16   3.)  Defendants claim that Plaintiff made several misrepresentations about its resources,

17   experience, and ability to produce a television awards show in order to convince

18   Productions to participate in the show.  (Dkt. no. 31 at 3-4.)

19         Productions signed an agreement to participate in October 2009.  The agreement

20   states: "legal disputes resolved by binding arbitration."  (Dkt. no. 32 at 14.)  Plaintiff

21   alleges that the agreement was for Productions to sponsor the event in the amount of

22   $1,425,000.   $125,000 of that was to be paid directly to Plaintiff; the remainder

23   Productions would pay directly to CBS.  (Dkt. no. 25 at ¶ 11.)   Productions hired

24   TeleNext, a television production company, to assist in the production.

25         The parties dispute what happened after this point. Plaintiff alleges that

26   Defendants exerted pressure on it to expand its production budget and transform the

27   awards show into a "garish Hollywood spectacle" rather than the "tasteful, solemn

28   tribute" Plaintiff originally envisioned.  (Dkt. no. 38 at 4.)  Defendants assert that Plaintiff

had always represented that it either had or would secure "some of the biggest names in film, television, and music" for the awards show, but that it later became aware to Productions that Plaintiff lacked the skills and capabilities to produce a high-quality awards show and that Plaintiff could not secure "A"-list celebrities for the show.  (Dkt. no. 31 at 4.)  Defendants assert that because Plaintiff was "unable to deliver as required by the Agreement," Productions exercised its "cancellation right" as set forth in the agreement.[1]  (*Id.*)

Productions failed to provide CBS the $1,000,000 line of credit due to CBS under the agreement.  The awards show did not happen.  Plaintiff asserts that "as a result of [Production's] breach and [D]efendants' tortious interference with the CBS contract," CBS chose not to go forward with the awards show and refused to do business with Operation: Heroes in the future.  (Dkt. no. 38 at 4.)

Plaintiff filed its original Complaint in this Court on February 10, 2012.  (Dkt. no. 1.)  Defendants now move to have the matter transferred to the United States District Court for the Southern District of Ohio, Western Division.  (Dkt. no. 31.)  Defendant Productions also moves to compel arbitration as set forth in the agreement between Productions and Plaintiff and to stay this proceeding during the course of the arbitration. (Dkt. no. 32.)

## II.    MOTION TO TRANSFER VENUE

### A.    Legal Standard

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice a district court may transfer any civil action to any other district or division where it might have been brought."  *Amazon.com v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1259 (W.D. Wash. 2005).  "The purpose of this section is to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public

---

[1]Defendants did, however, pay a $125,000 sponsorship fee and $300,000 to CBS upon exiting the project.

against unnecessary inconvenience and expense." *Id.* (citations and quotation marks omitted).

Motions to transfer venue are considered on "an individualized, case-by-case consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (internal quotation marks omitted). "The statute has two requirements on its face: (1) that the district to which defendants seek to have the action transferred is one in which the action might have been brought, and (2) that the transfer be for the convenience of parties and witnesses, and in the interest of justice." *Amazon*, 404 F. Supp. 2d at 1259 (citation and quotation marks omitted).  The burden of proof is on the moving party.  *Amini Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d 1093, 1109 (C.D. Cal. 2007).

Further, "[a] motion to transfer venue under § 1404(a) requires the court to weigh multiple factors in its determination whether transfer is appropriate in a particular case." *Jones*, 211 F.3d at 498.  "For example, the court may consider: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof." *Id.* at 498-99.

### B.   Analysis

The parties do not dispute that this case could have been filed in a federal district court in Cincinnati.  Because P & G Defendants reside in Cincinnati, Ohio, venue would be proper there.  *See* 28 U.S.C. § 1391(b)(1).  The remaining issues are whether transferring this case would better convenience the parties and witnesses and whether transfer serves the interest of justice.

///

///

1

2

**1.      Location where the relevant agreements were negotiated and executed**

3      Defendants claim that this factor favors transfer because the agreement was

4  drafted in Cincinnati. (Dkt. no. 31 at 19.)  Plaintiff counters that this factor favors Nevada

5  retaining jurisdiction because the series of meetings that led to the formation of the

6  agreement occurred in Las Vegas.  (Dkt. no. 38 at 10.)  The facts of *IDACORP, Inc. v.*

7  *Am. Fiber Sys., Inc.*, No. 1:11-CV-00654, 2012 WL 4139925, at *3 (D. Idaho Sept. 19,

8  2012), present a similar situation.  There, the court determined that factor one disfavored

9  transfer where the at-issue agreement was "mostly negotiated" in Idaho (where the

10  plaintiff filed suit), but "closed" in New York (the defendant's preferred forum).  Just as no

11  Operation: Heroes representatives traveled to Ohio here, no plaintiffs traveled to New

12  York in *IDACORP*.  *Id.*  And just as several of Defendants' representatives traveled to

13  Nevada here, the defendants in *IDACORP* traveled to Idaho several times.    *Id.*

14  Therefore, because negotiations involving both parties occurred in Nevada, while Ohio

15  was merely the location of the contract's final drafting, this factor favors Plaintiff.  *Accord*

16  *id.*

17

**2.      Familiarity with the relevant law**

18      The agreement states that the contract is subject to the laws and statutes of the

19  State of Nevada. (Dkt. no. 32 at 14.)    Defendants assert that this case is a

20  straightforward breach of contract claim, and therefore a Cincinnati district court judge

21  would have no difficulty interpreting and applying Nevada law to this case.[2]  Though that

22  may be true, Nevada courts are *more* familiar with Nevada law than are Ohio courts, and

23  therefore more adept at applying Nevada contract law to this case.

24

_____

25

26      [2]Plaintiff alleges primarily breach of contract claims, but also a claim for breach of
the implied covenant of good faith and fair dealing.  In its Opposition (dkt. no. 36),
Plaintiff asserts that this cause of action arises under tort law.  As discussed *infra*,

27  Plaintiff may be incorrect on this count.  However, the Court does not doubt that an Ohio
district could aptly interpret Nevada tort law regarding tortious breach of the covenant of

28  good faith and fair dealing were Defendants' Motion granted.

5

"As a general rule, if questions of substantive state law are raised in a particular action, it is advantageous to have those issues decided in a federal court sitting in the state whose substantive law governs." *IDACORP*, 2012 WL 4139925, at *4.  Defendants provide no reason why the general rule does not apply here.  This factor therefore favors Plaintiff, but only slightly so, because this case involves a relatively straightforward breach of contract claim that a Southern District of Ohio court could no doubt adroitly adjudicate.  *See id.* (Idaho federal court accorded little weight to this factor where the underlying New York law was not complex or significantly different from Idaho law).

### 3.    Plaintiff's choice of forum

A plaintiff's choice of forum generally receives deference in a motion to transfer venue.  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986).  "In evaluating a § 1404(a) motion, the citizen plaintiff's choice of a proper forum is entitled to paramount consideration . . . ."  *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) (citations and quotation marks omitted).  Further, Plaintiff is incorporated in Nevada, and "[g]enerally, the fact that a plaintiff has filed suit in the district where it resides is a sufficient connection to accord its choice of forum deference."[3] *Amini Innovation*, 497 F. Supp. 2d at 1110.

Defendants cite to *Weyerhaeuser NR Co. v. Robert Bosch Tool Corp.*, 2:11-cv-01793, 2012 U.S. Dist. LEXIS 13038, at *9 (D. Nev. Feb. 3, 2012), for the proposition that "[t]he level of deference accorded to the plaintiff's choice of forum is substantially less . . . when [the] plaintiff is not a resident of the chosen forum."  Yet in *Weyerhaeuser*, Plaintiff was incorporated in Washington and its principal place of business was also in Washington.  *See id.*  Although Plaintiff's principal place of business is California, not Nevada, Plaintiff is incorporated in Nevada.  This suffices to grant Plaintiff's choice of forum "paramount consideration."  *See Lens.com, Inc. v. 1-800 CONTACTS, Inc.*, 2:11-

---

[3]A corporation is a citizen both of the state in which it is incorporated and where it has its principal place of business.  28 U.S.C. § 1332(c)(1).

6

CV-00918-GMN, 2012 WL 1155470, at *4 (D. Nev. Apr. 4, 2012); *see also BostonScientific Corp. v. Johnson & Johnson Inc.*, 532 F. Supp. 2d 648, 655 (D. Del. 2008) ("[A] corporation's decision to incorporate in a particular state is a rational and legitimate reason to litigate in that state."). In *Lens.com*, plaintiff Lens.com was incorporated in Nevada with its principal place of business in Missouri. *Id.* at *5. There, the connection to Nevada was more tenuous than here because Nevada did not have any meaningful connection to the antitrust controversy in that case. *Id.* However, the court accorded paramount consideration to plaintiff Lens.com's choice of forum because of its Nevada incorporation. *Id* at *4-5. Like plaintiff in *Lens.com*, Operation: Heroes is a Nevada corporation with its principal place of business elsewhere. Accordingly, this factor weighs strongly in Plaintiff's favor.

### 4.    Parties' contacts with the District of Nevada and contacts relating to Plaintiff's cause of action in Nevada

P & G Defendants are headquartered in Cincinnati and do not have offices or employees in Nevada. (Dkt. no. 31 at 21). TeleNext is headquartered in New York City. However, the allegations in the First Amended Complaint ("FAC") demonstrate that both companies made contact with Nevada during the course of the negotiations surrounding the awards show project. Several representatives from Defendants' respective companies met with Plaintiff's representatives in Las Vegas in August 2009, October 2009, and January 2010. (Dkt. no. 38-1 at ¶¶ 3-5.)

Moreover, Operation: Heroes is a Nevada limited liability corporation with its bank account in Nevada. As mentioned, its primary place of business is California. (*See* dkt. no. 25 at ¶ 4.) But it is incorporated in Nevada and its principal, Mr. Foster, had significant contacts with Nevada during the course of his dealings with Defendants in preparation for the awards show.

Both of these factors favor Plaintiff. Because at least some of the events giving rise to this lawsuit occurred in Las Vegas, Nevada, all parties have contact with the District of Nevada. Conversely, there is no evidence that Plaintiff has had contact with

the Southern District of Ohio.  Moreover, the fact that the negotiations underlying the at-issue contract occurred in Nevada favors Plaintiff's position.  *See IDACORP*, 2012 WL 4139925 at *4 (holding that these factors favored Idaho retaining jurisdiction over the case where the at-issue contract "was largely negotiated in Idaho").

### 5.     Convenience of witnesses

Defendants assert that the vast majority of the witnesses and evidence relating to this case are located in the Southern District of Ohio. Specifically, eight potential witnesses and two additional persons who Defendants assert may be called as witnesses all reside in Cincinnati.   Further, Defendants assert that Cincinnati is a more convenient venue for TeleNext, because TeleNext employees regularly travel to Cincinnati for work.

Plaintiff counters that a number of third-party witnesses critical to resolving the dispute reside in or near Nevada.  Plaintiff lists seven potential witnesses who reside in Nevada.   Further, Plaintiff's principal, Mr. Foster, resides in California.   Contrary to Defendants' assertion that Mr. Foster would be "inconvenienced regardless of whether the action proceeds in Nevada or Ohio," California's proximity to Nevada makes it easier for Mr. Foster to travel to Las Vegas than to Ohio for trial.  (*See* dkt. no. 31 at 8.)

Defendants do not demonstrate that the parties' witnesses will be significantly more convenienced by a trial in Ohio than one in Nevada.  Each side claims that key witnesses reside in or near either Ohio or Nevada, so the Court determines that Las Vegas and Cincinnati are equally convenient (or, for some witnesses, inconvenient) forums.   This factor weighs in neither party's favor.

### 6.     Availability of compulsory process to compel unwilling witnesses

It appears as if both parties plan on calling corporate officers and employees as well as third-party witnesses to testify at trial.  Third party witnesses cannot be compelled to testify by either this Court or an Ohio court.  *See* Fed. R. Civ. P. 45(b)(2), ///

8

1   45(c)(3)(A)(ii) (a court cannot serve a subpoena upon a non-party witness outside 100

2   miles of the district in which the court sits).

3          On the other hand, courts are split on whether corporate party employees may be

4   subject to being subpoenaed to attend trial occurring outside the Fed. R. Civ. P. 45(b)(2)

5   100-mile limit on service of subpoenas.  In *In re Vioxx Prods. Liab. Litig.*, 438 F. Supp.

6   2d 664, 667 (E.D. La. 2006), the court held that the "plain, unambiguous language of

7   Rule 45" holds that corporate officers are subject to being subpoenaed to attend a trial

8   occurring outside the 100-mile limit on service of subpoenas on non-parties." The *Vioxx*

9   court reasoned that because "Rule 45(c)(3)(A)(ii) mandates that a district court must

10   quash a subpoena if it requires 'a person who is *not a party* or *an officer of a party*' to

11   travel more than 100 miles from his residence or place of employment . . . Rule

12   45(c)(3)(A)(ii) [also] supports the inverse inference that Rule 45(b)(2) empowers the

13   Court with the authority to subpoena [the corporate officer] . . . to attend a trial beyond

14   the 100 mile limit." *Id.* (emphasis in original); *see also Commonwealth Capital Corp. v.*

15   *City of Tempe*, No. 2:09-CV-00274 JWS, 2011 WL 1237559, at *1 (D. Ariz. Apr. 1, 2011)

16   ("Rule 45(c)(3)(A)(ii) would be nonsensical if an officer of a party could not be served

17   more than 100 miles from the location of the trial.").  *But see Johnson v. Big Lots Stores,*

18   *Inc.*, 251 F.R.D. 213, 218 (holding that the subpoena power over parties was not

19   expanded by Rule 45(c)(3)(A)(ii) because "[t]he better reading of subdivisions (b)(2) and

20   (c)(3)(A)(ii) of Rule 45 is that the territorial scope of a court's subpoena power is defined

21   by subdivision (b)(2), subject to the limitations spelled out in subdivision (c)(3)(A)(ii).

22   Thus, to compel a person to attend trial, the person must be served with a subpoena in

23   one of the places listed in Rule 45(b)(2) *and* not be subject to the protection in Rule

24   45(c)(3)(A)(ii).").

25          For the purposes of this Motion, this factor is neutral.  That is, if the *Vioxx* and

26   *Commonwealth* courts correctly interpret Rules 45(b)(2) and 45(c)(3)(A)(ii), then this

27   Court can compel Defendants' corporate officers to testify and a Southern District of

28   Ohio court could compel Plaintiff's officers to testify.  However, if the *Big Lots* court's

interpretation of the subpoena rules holds, then neither court could compel unwilling corporate officers or employees to testify at trial.   Further, the respective courts are equally without power to compel unwilling third-party witnesses.[4]

### 7.   Ease of access to sources of proof

Defendants assert that all of the hard copy documents related to the awards show as well as several hard drives containing pertinent evidence are located in Cincinnati. (Dkt. no. 31 at 21.)  But Defendants have not shown why these documents are difficult or costly to transport.  *Cf. Kida W. Holdings, LLC v. Mercedes-Benz of Laguna Niguel*, No. 3:07-CV-00523, 2008 WL 217043, at *4 (D. Nev. Jan. 18, 2008) ("much of the evidence Defendants cite is easily transported to the District of Nevada and Defendants have not shown that they would be significantly burdened by transporting the documents.")

In light of the foregoing, this factor only slightly favors Defendants because the evidence existing in Cincinnati is easily transportable.  *See Kida*, 2008 WL 217043, at *4.

### 8.   Cost differential of litigating in the two potential forums

Plaintiff's witnesses would have to travel from California, Nevada, and Arizona to Cincinnati were this case transferred.  If it is not, Defendants' witnesses, hard drives, and hard copy documents will have to travel to Nevada from Indiana, Ohio, and New York. In either scenario, one party will have to bear significant travel costs.   This factor therefore favors neither party.

### 9.   Balancing the Factors

On balance the *Jones* factors disfavor transferring this case to Cincinnati. Nevada is Plaintiff's preferred choice of forum, Plaintiff is incorporated in Nevada, many

---

[4]Notably, under *Vioxx*, this factor may slightly favor Nevada retaining jurisdiction over this case, because the parties' initial lists of potential witnesses demonstrate that more of Defendants' officers or employees may be called as witnesses whereas Plaintiff has fewer employees, and more third-party witnesses, whom may be called to testify. But none of the parties have stated a desire to compel any witnesses to testify, so it would be premature for the Court to determine that this factor favors Plaintiff at this point in the proceeding.

of the events giving rise to the dispute occurred in Las Vegas, and Plaintiff and its witnesses have little or no connection to Cincinnati.

Although it would be more convenient for Defendants to litigate in Ohio, it would be less convenient for Plaintiff.   Section 1404(a) "provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient, and a transfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer."   *K-Tel Int'l, Inc. v. Tristar Prods., Inc.*, 169 F. Supp. 2d 1033, 1045 (D. Minn. 2001).

For these reasons, Defendants' Motion to Transfer Venue is denied.[5]

## III.   MOTION TO COMPEL ARBITRATION

Defendant Productions moves to compel arbitration under the terms of the agreement and to stay the litigation pending arbitration.[6]   Plaintiff argues that Productions has waived its right to arbitrate.  Importantly, Company and TeleNext were not parties to the agreement and do not join in Productions' Motion to Compel Arbitration.

The parties have both attempted to compel arbitration at different times. Defendant initiated arbitration proceedings in Ohio during April 2010, but Plaintiff did not participate because it did not believe Ohio to be the proper venue.  (Dkt. no. 25 at ¶ 18.)

---

[5]The parties did not present argument regarding the third element set forth in 28 U.S.C. § 1404(a) – whether transfer is in the interest of justice.

[6]Productions requests that the Court order arbitration in Cincinnati, Ohio.  But because the Court denies Defendants' Motion to Transfer Venue, the appropriate venue for arbitration is the District of Nevada.  *See* 9 U.S.C. § 4:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. *The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.*

(emphasis added).

1   Plaintiff initiated an arbitration proceeding in Nevada in March 2011, but this time

2   Defendant refused to arbitrate because it believed the proper venue for arbitration was

3   Ohio.  The agreement does not contain a forum-selection clause.

4       **A.   Legal Standard**

5       "[A]n agreement to arbitrate is a matter of contract: 'it is a way to resolve those

6   disputes—but only those disputes—that the parties have agreed to submit to arbitration.'"

7   *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citing

8   *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). Moreover,

9           [b]ecause the Agreement is "a contract evidencing a transaction involving
10          commerce," it is subject to the FAA. 9 U.S.C. § 2. The FAA provides that
            any arbitration agreement within its scope "shall be valid, irrevocable, and
11          enforceable," *id.,* and permits a party "aggrieved by the alleged . . . refusal
            of another to arbitrate" to petition any federal district court for an order
12          compelling arbitration in the manner provided for in the agreement. *Id.* at §
            4.  By its terms, the Act "leaves no place for the exercise of discretion by a
13          district court, but instead mandates that district courts *shall* direct the
            parties to proceed to arbitration on issues as to which an arbitration
14          agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S.
            213, 218, 158 (1985). The court's role under the Act is therefore limited to
15          determining (1) whether a valid agreement to arbitrate exists and, if it does,
            (2) whether the agreement encompasses the dispute at issue.  *See* 9
16          U.S.C. § 4; *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 719-20 (9th
            Cir.1999); *see also Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d
17          469, 477-78 (9th Cir.1991).  If the response is affirmative on both counts,
            then the Act requires the court to enforce the arbitration agreement in
            accordance with its terms.
18

19  *Chiron Corp.*, 207 F.3d at 1130 (emphasis in original).

20      Three factors must be met before a party can be found to have waived its right to

21  compel arbitration: "(1) the party must know of an existing right to compel arbitration; (2)

22  the party must engage in acts inconsistent with that right; and (3) the party opposing

23  arbitration must suffer prejudice as a result of the inconsistent acts."  *Convergys Corp.*

24  *v. Freedom Wireless, Inc.*, No. 2:06CV0644, 2006 WL 2927841, at *2 (D. Nev. Oct. 12,

25  2006) (citing *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1012 (9th Cir. 2005); *Fisher v. A.G.*

26  *Becker Paribas, Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)).  "A finding that a contractual

27  right to arbitration has been waived is not favored."  *Id.*  Accordingly, "any party arguing

28  ///

1    waiver of arbitration bears a heavy burden of proof." *Fisher*, 791 F.2d at 694 (quotations

2    omitted).

3        **B.    Analysis**

4        The parties do not dispute that (1) a valid agreement to arbitrate exists, and (2)

5    the agreement encompasses all non-tort claims between Plaintiff and Productions.

6        Plaintiff asserts that the agreement does not encompass its tort claim against

7    Productions.  Plaintiff further asserts that Productions waived its arbitration right because

8    it refused to arbitrate during March 2011 and continues to refuse to arbitrate.  (Dkt. no.

9    36 at 5.)

10            **1.    Whether Defendant Waived its Right to Arbitrate**

11        Plaintiff argues that Productions engaged in acts inconsistent with its right to

12   arbitrate because it has filed "numerous motions" in the case, thereby availing itself to

13   the court system.  (Dkt. no. 36 at 7.)  Yet this alone does not satisfy the "heavy burden of

14   proof" required to establish that Productions has waived its arbitration right.

15        Two cases help elucidate this point.  In *Brown v. Dillard*, 430 F.3d 1004, 1007-09

16   (9th Cir. 2005),

17          plaintiff instituted arbitration in the manner required by the parties'
         agreement after being terminated for allegedly adding ten minutes to her
18       timecard."  *Brown*, 430 F.3d at 1007-09.  She also made numerous
         attempts over a two month period to initiate arbitration after her former
19       employer refused to respond to her initial request.  *Id.* at 1009.  Plaintiff
         only succeeded in making contact with her former employer once, at which
20       time she was informed that her complaint had no merit and that [the]
         employer refused to arbitrate."  *Id.*  Plaintiff then filed suit and her former
21       employer moved to compel arbitration.  *Id.*  The Ninth Circuit held that
         plaintiff's employer "breached its agreement with Brown by refusing to
22       participate in the arbitration proceedings Brown initiated"; as such, the
         court refused to compel arbitration. *Id.* at 1010-12.

23

24   *Am. Cardio, LLC v. Itamar-Med., Inc.*, No. 6:12-CV-00457-AA, 2012 WL 2889047, at *5

25   (D. Or. July 13, 2012).  Conversely, in *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114,

26   1117-1118 (9th Cir. 2008),

27          plaintiff sent a letter to his employer, demanding arbitration, after being
         accused of having an inappropriate relationship with one of his female
28       subordinates. The employer responded that arbitration was premature.  *Id.*

13

After his subsequent termination, plaintiff filed suit and his former employer moved to compel arbitration. *Id.* The Ninth Circuit found that plaintiff failed to follow the initiation procedures. *Id.* at 1122. As "the non-complying party," the court held that plaintiff was unable to "establish that [his former employer] repudiated the arbitration agreement." *Id.* In so holding, the court expressly discussed *Brown* and determined that it was distinguishable because the "plaintiff in Brown made heroic efforts to initiate arbitration [whereas] Cox did not comply with the terms of the agreement." *Id.* at 1123.

*Am. Cardio*, 2012 WL 2889047, at *5.

This case is more similar to *Cox.* Unlike defendant in *Brown*, Productions has not consistently rebuffed the terms of the agreement. Productions did attempt to arbitrate the case, albeit in Ohio. Plaintiff refused. When Plaintiff initiated arbitration in Nevada, this time Productions refused to participate. It is clear that the dispute over arbitration is related to the Motion to Transfer Venue. That is, both parties acknowledge the arbitration clause in the agreement and agree that it applies (at least in part) to this lawsuit. The primary disagreement appears to be *where* to arbitrate. As that dispute was resolved by the Court *supra*, the prudent course of action is to compel arbitration in Nevada. *See* 9 U.S.C. § 4 ("the court shall make an order directing the parties to proceed to arbitration . . . [t]he hearing and proceedings . . . shall be within the district in which the petition for an order directing such arbitration is filed.")

Plaintiff asserts that Productions will be able to "take a second bite at the apple to reargue in arbitration any issues it loses in its other motions," and that this will result in substantial prejudice to Plaintiff. (Dkt. no. 36 at 8.) However, Plaintiff cites to no law demonstrating that the principles of issue preclusion are not binding upon an arbitral forum. In fact, the parties' agreement holds that the laws and statutes of the State of Nevada apply to any dispute between Plaintiff and Productions, and therefore the arbitrator must apply principles of claim preclusion to this case. (*See* dkt. no. 32 at 14.) As such, the Court has no reason to doubt that its Orders in this case will be enforced by

///

///

///

14

1   the arbitrator, and Plaintiff need not fear that Productions will take any second bite at the

2   proverbial apple.[7]

3           **2.      Whether the Arbitration Clause Encompasses Plaintiff's Tort**

4           **Claim against Productions**

5           Plaintiff asserts that its claim for breach of the covenant of good faith and fair

6   dealing is a tort claim not subject to arbitration under the agreement.  However, it is not

7   clear that Plaintiff can state a claim for *tortious* breach of the covenant of good faith and

8   fair dealing.  "Tort liability for breach of the implied covenant of good faith and fair

9   dealing is appropriate where the party in the superior or entrusted position has engaged

10  in grievous and perfidious misconduct."  *State, Univ. & Cmty. Coll. Sys. v. Sutton*, 120

11  Nev. 972, 989 (2004) (quotation marks and citation omitted).  "If a relationship is nothing

12  more than an arm's length transaction, such a relationship cannot give rise to a tort claim

13  for violation of the covenant of good faith and fair dealing."  *Enriquez v. J.P. Morgan*

14  *Chase Bank, N.A.*, No. 2:08CV01422, 2009 WL 160245, at *7 (D. Nev. Jan. 22, 2009).

15  Moreover, while Plaintiff's FAC alleges that Productions had "vastly superior bargaining

16  power" to itself, the FAC does not list a cause of action for "tortious breach of the implied

17  covenant of good faith and fair dealing," but rather Plaintiff pleads "breach of the implied

18  covenant of good faith and fair dealing."  (Dkt. no. 25 at 6.)

19          Even assuming *arguendo* that Plaintiff can successfully bring a claim for the

20  tortious breach of the implied covenant of good faith and fair dealing against

21  ///

22

23  ————————————————

24          [7]Plaintiff's claims that it has been prejudiced by "expense and delay" are without
    merit. As discussed, the parties are equally to blame for delaying the arbitration
25  proceedings.  And even if compelling arbitration causes Plaintiff additional expense,
    such expense does not constitute prejudice here.  For, "when a party to an agreement
26  that makes arbitration of disputes mandatory chooses to violate that agreement by
    opting to litigate claims in court, any extra expense incurred by that party as a result of
27  its deliberate choice of an improper forum, in contravention of [its] contract cannot be
    charged to the other party."  *In re Apple & AT & TM Antitrust Litig.*, 826 F. Supp. 2d
28  1168, 1174 (N.D. Cal. 2011*) motion to certify appeal granted*, C 07-05152 JW, 2012 WL
    293703 (N.D. Cal. Feb. 1, 2012) (citation, quotation marks, and brackets omitted).

1    Productions, the Court determines that such a claim is subject to the arbitration

2    provision.

3         Plaintiff argues that its tort claim should not be covered under the arbitration

4    provision because the claim arises out of the partnership between Productions and

5    Plaintiff, rather than out of the contract itself.  At the same time, Plaintiff acknowledges

6    that the arbitration clause is ambiguous as to what it exactly covers, because it only

7    states "legal disputes resolved by binding arbitration."

8         The relative breadth or narrowness of an arbitration provision is important in

9    determining which causes of action may be arbitrated.  There is a dispute among the

10   circuits regarding the interpretation of certain common arbitration provisions:

11   > In cases construing agreements requiring arbitration for disputes "arising under"
     > or "arising out of" the agreement or arising "hereunder," there is a split of authority
12   > among federal courts as to how such language should be interpreted. Some
     > courts, primarily in the Ninth Circuit, construe that type of arbitration language as
13   > being narrow and restrict arbitration only to disputes relating to interpretation and
     > performance of the contract. *See Mediterranean Enters., Inc.*, 708 F.2d 1458; *In*
14   > *re Kinoshita & Co.*, 287 F.2d 951 (2d Cir. 1961); *Cape Flattery Ltd.*, 607 F. Supp.
     > 2d at 1185-88. On the other side, some courts construe such language broadly.
15   > *See Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 380-82 (1st
     > Cir. 2011) (rejecting *Kinoshita)*; *Battaglia v. McKendry*, 233 F.3d 720, 725-27 (3d
16   > Cir. 2000); *Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382, 385 (11th Cir.
     > 1996).

17

18   *County of Hawai'i v. Unidev, LLC*, CAAP-10-0000188, 2012 WL 3791448, at *17 (Haw.

19   Ct. App. Aug. 31, 2012).

20        Plaintiff is correct that the language in the agreement is not a "model of

21   draftsmanship." However, Plaintiff is incorrect that the language in the arbitration

22   provision is even narrower than the "arising under" language referenced above.  Rather,

23   as Plaintiff states, the clause "has absolutely no limits on the types of disputes" it applies

24   to, which demonstrates that it is a broad provision.  The provision does not narrow

25   arbitration to disputes "arising under" the contract, or to certain types of disputes.  "When

26   an arbitration clause is interpreted broadly, it reaches every dispute between the parties

27   having a significant relationship to the contract and all disputes having their origin or

28   genesis in the contract."  *Golden v. Dameron Hosp. Ass'n*, No.  S-12-0751 LKK, 2012

WL 4208779, at *5 (E.D. Cal. Sept. 19, 2012) (quotation marks and citation omitted). "Further, the dispute at issue need only touch matters covered by the contract, in order for the court to resolve all doubts in favor of arbitration." *Id.* (quotation marks and citation omitted). Plaintiff concedes that all of its claims against Productions concern the Operation: Heroes awards show sponsorship.   Accordingly, the Court determines that because Plaintiff's breach of the covenant of good faith and fair dealing cause of action arises out of the same claims as its other claims, the claim is covered by the arbitration provision.

For the reasons stated above, Defendant Productions' Motion to Compel Arbitration is granted.

## IV.   MOTION TO STAY

Productions also moves to stay the case.   9 U.S.C. § 3 requires a court to stay any arbitrated action "until such arbitration has been had . . . ."  Therefore, the litigation between Plaintiff and Productions is stayed.

Productions also requests that the case be stayed against Defendants Company and TeleNext pursuant to the Court's inherent powers to stay judicial proceedings.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  Company and TeleNext do not oppose a stay. However, neither Company nor TeleNext were a party to the agreement. Defendants do not assert why, other than the arbitration provision between Productions and Plaintiff, this case should be stayed.  As the parties present no compelling reason to stay proceedings against Company or TeleNext, the proceedings are stayed as to Defendant Procter & Gamble Productions, Inc. only.

## V.   CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion to Transfer Venue (dkt. no. 31) is DENIED.

IT IS FURTHER ORDERED that Defendant Procter & Gamble Productions, Inc.'s Motion to Compel Arbitration (dkt. no. 32) is GRANTED.

///

1    IT IS FURTHER ORDERED that Defendant Procter & Gamble Productions, Inc.'s

2   Motion to Stay (dkt. no. 32) is GRANTED IN PART and DENIED IN PART.  The Clerk of

3   the Court is directed to stay the proceedings against Defendant Procter & Gamble

4   Productions, Inc.  The case will proceed against all other Defendants.

5    DATED THIS 11th day of October 2012.

6

7

8   _____
                            MIRANDA M. DU
                    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28