UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| OPERATION: HEROES, LTD.,<br><br>                    Plaintiff,<br><br>   v.<br><br>PROCTER & GAMBLE PRODUCTIONS, INC., et al.<br><br>                    Defendants. | Case No. 2:12-cv-00214-RFB-GWF<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br>**(ECF No. 65)**<br><br>(ECF No. 65) |

**I. INTRODUCTION**

The instant case arises out of a breach of contract dispute. Plaintiff Operation: Heroes, LTD., developed the idea for an annual televised awards show to honor military personnel. Plaintiff entered into contracts with Procter & Gamble Productions, Inc., (PGP) to sponsor the inaugural show and with CBS to broadcast the taped production. The relationships between Plaintiff and PGP and Plaintiff and CBS eventually deteriorated and as a result, the Operation: Heroes production never materialized. Plaintiff filed suit against PGP, its parent company Procter & Gamble Company (P & G), and TeleNext Media, Inc., (TeleNext), a production company hired by PGP to assist with Operation: Heroes, alleging state tort and contract claims. Defendants P & G and TeleNext now move for summary judgment on both of Plaintiff's claims against them. The

Court finds that Plaintiff has failed to factually support the elements of its claims and there is no genuine dispute as to any material fact for trial, and therefore both of Plaintiffs' claims against P & G and TeleNext will be dismissed in their entirety.

**II. FINDINGS OF FACT**

The Court finds the following facts to be undisputed. Plaintiff created and developed the idea for an awards show titled "Operation: Heroes" which was to honor American military and first responders. Am. Compl., ECF No. 25 p. 2. The Principal of Operation: Heroes is R.C. "Chuck" Foster. Plaintiff planned to produce a television special to air over Memorial Day Weekend 2010, followed by a national bus tour, a television documentary, and related merchandise. ECF No. 25 p. 2.

In June 2009, Plaintiff entered into a Network Television Agreement with CBS. ECF No. 72 Ex. 2 p. 34, ("CBS Contract"). The CBS Contract secured an air date for Operation: Heroes, a two-hour awards show that would be taped on May 22, 2010, and air on May 30, 2010. In pertinent part, the CBS Contract required Plaintiff to: (1) pay or provide a letter of credit for $1.3 million for 40 advertising units ("time buys") and (2) obtain CBS approval on all aspects of the show by May 9, 2010. Id. The CBS Contract required Plaintiff to make an advance payment of $300,000 by February 15, 2010, and to secure the remaining $1,000,000 by establishing an irrevocable letter of credit to be delivered to CBS no later than March 30, 2010. Id. The Contract also gave CBS an option for renewal.

In early August 2009, Foster telephoned Robert McDonald, then-CEO of P & G, to discuss possible sponsorship opportunities for Operation: Heroes. ECF No. 65 Ex. 2, Foster dep., pp. 26-27, 33-35. Richard DelCore, then-head of Global Branded Entertainment for P & G, subsequently contacted Foster to set up a meeting to discuss Operation: Heroes. DelCore's responsibilities at P & G included management of PGP, a wholly owned subsidiary of P & G. Id. Ex. 5, DelCore dep. p. 91 ¶¶ 18-19; Id. Ex. 6, Jackson dep. p. 25 ¶¶ 19-21. At the end of August 2009, representatives of P & G, PGP, and TeleNext met with representatives of Operation: Heroes at the Tropicana Las Vegas to discuss the show and possible sponsorship opportunities. ECF No. 65 p. 4; ECF No. 72

p. 3. TeleNext is a production company that routinely provided production support for PGP entertainment initiatives. DelCore dep. p. 9 ¶ 15-19; Grieci dep. p. 15-16. As a result, DelCore involved representatives of TeleNext in evaluating the Operation: Heroes proposal and ultimately hired TeleNext to assist in administering the PGP Contract. DelCore dep. p. 9 ¶ 18-19

Shortly after the meeting in Las Vegas, in October 2009, Plaintiff and PGP entered into an Exclusive Presenting Sponsorship Agreement. ECF No. 72 Ex. 4 p. 3, ("PGP Contract"). Under the PGP contract, PGP agreed to pay Plaintiff a $125,000 sponsorship fee and to pay $1.3 million directly to CBS, per the terms of the CBS Contract. Id. PGP also agreed to provide P & G digital and public relations support, as deemed appropriate, and P & G product contributions for promotion and publicity use. Id. PGP was to receive exclusive presenting sponsorship of Operation: Heroes and have "[p]artnership-type input and final approval of O.H. of TV show, venue, content production, etc." Id. The PGP Contract also gave PGP "first right of refusal in perpetuity to renew for subsequent years including the option for PGP to obtain equity ownership in [Operation: Heroes]". Id. Plaintiff agreed to provide the Operation: Heroes event on May 22, 2010, the May 30, 2010, CBS broadcast, "A" list talent, and sponsorships and/or TV ad unit sales to cover remaining production costs. Id. The Contract was voidable "[i]f OH fail[ed] to deliver the Operation: Heroes TV show as scheduled and/or any other . . . deliverables (at or above P & G standards of excellence)." Id. The Contract does not contain specific dates by which certain deliverables were to be met.

The record reflects that the relationship between PGP and Plaintiff deteriorated over the course of the next few months due to a philosophical difference between the parties as to the proper role of PGP with respect to the Operation: Heroes project based on the "partnership-type input and final approval" language in the PGP Contract. Plaintiff became dissatisfied with PGP's lack of public relations support and attempted involvement in the production of Operation: Heroes, while PGP became dissatisfied with Plaintiff's lack of progress in meeting certain contract deliverables, including securing additional sponsors. On February 12, 2010, PGP paid $300,000 to CBS per the terms of the PGP and CBS contracts. Later that day, however, DelCore informed Foster that PGP would not be providing the $1 million letter of credit ("LOC") to CBS when it became due on

March 30, 2010. DelCore wrote: "We believe payment of the $300,000 discharges all P & G financial obligations until airing of a show meeting the [requirements outlined in the PGP Contract]". ECF No. 65 Ex. 13 p. 32, DelCore e-mail. Sometime after March 30, 2010, CBS canceled the CBS Agreement for non-payment and the Operation: Heroes show never materialized. ECF No. 25 p. 7.

Plaintiff subsequently filed suit against PGP, P & G and TeleNext, alleging: (1) Breach of Contract (against PGP); (2) Breach of the Implied Covenant of Good Faith and Fair Dealing (against PGP); (3) Interference with Contract (against all defendants); and (4) Interference with Prospective Economic Advantage (against all defendants). ECF No. 25 p. 5-9. This Court's October 11, 2012, Order granted PGP's motion to compel arbitration, and stayed the litigation between Plaintiff and PGP. ECF No. 46 p. 17. The Court, however, declined to stay the litigation against P & G and TeleNext. Id. at 18. Remaining defendants P & G and TeleNext (collectively "Defendants") now move for summary judgment on both of Plaintiff's claims against them.

### III. LEGAL STANDARD

#### A. Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

### IV. DISCUSSION

#### A. Intentional Interference with Contractual Relations

**1. Legal Standard**

In order to prevail on a claim for intentional interference with contractual relations under Nevada law, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damages. Sutherland v. Gross, 772 P.2d 1287, 1290 (Nev. 1989) (citing Ramona Manor Convalescent Hosp. v. Care Ent., 225 Cal. Rptr. 120, 124 (Cal. Ct. App. 1986)). "[M]ere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff." J.J. Indus. v. Bennett, 71 P. 3d 1264, 1268 (Nev. 2003).

**2. Intentional Interference with Contractual Relations against P & G**

Defendants argue that Plaintiff's interference claim against P & G fails because P & G, as the parent company of PGP, is privileged to interfere with the contracts of its wholly owned subsidiary. ECF No. 65 p. 2. Alternatively, Defendants argue that P & G cannot be held liable for interfering with the contracts of PGP under the "not-a-stranger" doctrine. Id. Finally, Defendants argue that even if the Court declines to recognize these defenses, Plaintiff's claim fails because Plaintiff has not factually supported the elements of its claim.

Plaintiff points out that the Nevada Supreme Court has not expressly adopted the "not-a-stranger'' doctrine or recognized a privilege for parent companies to interfere with the contracts of their subsidiaries. Additionally, Plaintiff argues that even if the Court adopts these doctrines, P & G has no special relationship with CBS which could excuse P & G's alleged interference with the CBS contract. ECF No. 72 p. 19.

**a. The "Not-a-Stranger" Doctrine**

A minority of courts have held that non-contracting parties with sufficient economic connections to the contract or business relationship underlying the contract are not "strangers" or third parties to the contractual relationship and therefore cannot be liable for tortious interference. See e.g., Atlanta Mkt. Ctr. Mgmt. Co. v. McLane, 503 S.E. 2d 278, 283 (Ga. 1998). The Nevada Supreme Court has neither accepted nor rejected this rule.

"When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." Aetna Cas. & Sur. Co. v. Sheft, 989 F.2d 1105, 1108 (9th Cir. 1993). "[W]here Nevada law is lacking, its courts have looked to the law of other jurisdictions, particularly California, for guidance." Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP, 583 F.3d 1232, 1237 (9th Cir. 2009).

The "not-a-stranger" rule is in a state of flux in California, and has "spawned much controversy in both the California courts and [the Ninth Circuit]." Fresno Motors, LLC v. Mercedez Benz USA, LLC, 771 F.3d 1119, 1126 (9th Cir. 2014). While some earlier California cases held that the rule barred suit even against non-contracting parties with sufficient economic interests in the underlying contract, recently, the California courts have scaled back and have consistently held that the rule applies only to parties to the contract. See e.g., Powerhouse Motorsports Grp. Inc., v. Yamaha Motor Corp., 164 Cal. Rptr. 3d 811, 825 (Cal. Ct. App. 2013); United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc., 766 F.3d 1002, 1007-08 (9th Cir. 2014) (predicting that under California law only parties to the contract are immune from claims for intentional interference with existing contractual relations).

The Court declines to apply the "not-a-stranger" doctrine to immunize P & G from liability as urged by Defendants because to do so would be a substantial expansion of Nevada law. Moreover, the Court believes that were this issue before the Nevada Supreme Court, that Court would likely follow the recent trend of the California courts and hold that only parties to the contract are immune from claims for intentional interference with contractual relations under this doctrine. Accordingly, Defendants' motion for judgment as a matter of law with respect to Claim Three against P & G for interference with the PGP Contract under the "not-a-stranger" doctrine is denied.

### b. The Parent Company Privilege

Courts across the country have uniformly held that a parent company is privileged to interfere with the contracts of its wholly-owned subsidiary when the contract threatens a present

economic interest of that subsidiary, absent clear evidence that the parent company employed improper means or acted with an improper purpose. See, e.g., Truckstop.Net, L.L.C. v. Sprint Commc'ns Co., 537 F. Supp. 2d 1126, 1140 (D. Idaho 2008) (collecting cases); MGP Ingredients, Inc., v. Mars, Inc., 465 F. Supp. 2d 1109, 1114 (D. Kan. 2006) (collecting cases). The Nevada Supreme Court has neither adopted nor rejected this privilege. JP Morgan Chase Bank, N.A. v. KB Home, 632 F. Supp. 2d. 1013, 1028 (D. Nev. 2009) (recognizing the uniformity but not reaching the issue). Plaintiff has not cited a single case to the contrary.

In light of the wide-spread acceptance of the qualified privilege of a parent company to interfere with the contracts of his wholly-owned subsidiary and the lack of any authority to the contrary, the Court will recognize a qualified parent company privilege for purposes of this litigation. A parent company is privileged to interfere with the contracts of its wholly-owned subsidiary as long as the parent company does not employ improper means or act with an improper purpose. The Court believes that were this issue before the Nevada Supreme Court, that Court would likely join the majority of courts across the country and adopt this privilege. Moreover, it is not unfair to apply this privilege on the facts of this case because Plaintiff was well aware of P & G's involvement with and influence over the PGP Contract since its inception. P & G representatives were present for contract negotiations, P & G is repeatedly mentioned in the PGP Contract, and all deliverables under the contract were to be at or above "P & G standards of excellence." Additionally, there is no indication that Plaintiff questioned DelCore's authority to communicate that PGP would not be delivering the LOC to CBS, as Plaintiff repeatedly identifies this communication as the date of breach.

Plaintiff has failed to set forth any evidence that P & G acted unlawfully or with an improper purpose when it caused PGP to refuse to deliver the LOC to CBS, rather than to protect the financial interests of PGP and P & G. Plaintiff argues that "P & G forced [PGP] to undeniably breach its agreement with OH by ordering it not [to] make the payment that was required of it." ECF No. 72 p. 16. Even if PGP's failure to provide the $ 1 million LOC to CBS was a breach (which is disputed), merely causing the subsidiary to breach a contract is not independently wrongful conduct such that it would be outside of the privilege. There is no evidence that P & G

abused its fiduciary relationship with PGP or otherwise coerced PGP not to perform. For these reasons, the Court will dismiss Plaintiff's claim against P & G for intentional interference with the PGP Contract. The parent company privilege, however, does not apply to Plaintiff's claim for intentional interference by P & G with the CBS Contract.

### 3. Intentional Interference with the CBS Contract

The parties do not dispute that Plaintiff had a valid and existing contract with CBS or that Defendants had knowledge of the existence of the CBS Contract. Accordingly, the Court analyzes only the final three elements: intentional acts intended or designed to disrupt the contractual relationship, actual disruption of the contract, and resulting damages.

Plaintiff argues that P & G "caused PGP not to pay the $ 1 million to CBS because [DelCore] did not believe PGP was required to do so . . . . That alone is a sufficient act to constitute interference by P & G." ECF No. 72 p. 17. While Plaintiff has identified a volitional act which may have resulted in the interference, this alone is not sufficient. Plaintiff must show that P & G's actions were <u>intended or designed</u> to disrupt the CBS Contract. The Nevada Supreme Court has explained that general intent will not subject an actor to liability for intentional interference with contract, rather, specific intent is required:

> The fact of a general intent to interfere, under a definition that includes imputed knowledge of consequences, does not alone suffice to impose liability. Inquiry into the motive or purpose of the actor is necessary . . . . Where the actor's conduct is not criminal or fraudulent, and absent some other aggravating circumstance, it is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly.
> <u>J.J. Indus. v. Bennett</u>, 71 P. 3d 1264, 1268 (Nev. 2003).

Thus, to prevail on this claim, Plaintiff must set forth evidence from which a reasonable jury could conclude that P & G caused PGP to refuse to deliver the LOC for the specific purpose of disrupting the CBS Contract. <u>See</u> <u>Id.</u> Plaintiff has not pointed to any evidence in the record that would tend to show that P & G caused PGP to refuse to deliver the LOC for this impermissible purpose, rather than to protect the financial interests of P & G and PGP. The fact that P & G timely made the nonrefundable $300,000 payment to CBS and informed Foster one and one half months prior to the $ 1 million LOC being due that PGP would not be delivering the LOC is also at least

some evidence that P & G did not specifically intend to disrupt the CBS Contract. In any event, P & G's knowledge that its failure to provide the LOC would likely result in the disruption of the CBS Contract because Plaintiff would be unable to obtain the funds elsewhere is not enough to establish the requisite intent for liability for intentional interference with contract under Nevada law. See Id.

Because P & G was privileged to interfere with the PGP Contract and because Plaintiff has failed to set forth sufficient evidence that P & G intended to specifically and intentionally cause disruption of the CBS Contract, Plaintiff's claim for intentional interference with the CBS Contract against P & G will be dismissed.

### 4. Intentional Interference with Contractual Relations Claim Against TeleNext

Defendants argue that TeleNext, as an agent of PGP, cannot be liable for interference with PGP's contracts. ECF No. 65 p. 18. Defendants further argue that Plaintiff has failed to set forth sufficient evidence to support the elements of this claim. Plaintiff argues that Defendants have failed to prove that TeleNext was an agent of PGP and therefore TeleNext can be liable for interference with both the PGP and CBS Contracts. Plaintiff does not appear to dispute that if TeleNext was an agent of PGP, it cannot be liable for interference with the PGP Contract.

#### a. Agency

Plaintiff argues that Defendants have failed to establish an agency relationship between PGP and TeleNext because Defendants have offered no express agency agreement and PGP did not hold TeleNext out as its agent. ECF No. 72.

Under Nevada law, an agent acting within the scope of his principal's interest cannot be held liable for contractual interference because the agent does not constitute an intervening third party. Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911 (D. Nev. 1993). Generally, an agency relationship results when one person hires another to act on his behalf and subject to his control. The party asserting the agency relationship has the burden of proving the relationship by a preponderance of the evidence. Hamm v. Arrowcreek Homowners' Ass'n, 183 P.3d 895, 903 (Nev. 2008).

The Court finds that Defendants have set forth sufficient undisputed facts to demonstrate that an agency relationship existed between TeleNext and PGP with respect to Operation: Heroes based on the following facts: (1) Representatives of TeleNext were present for contract negotiations in Las Vegas; (2) Grieci of TeleNext was appointed as the "point person" between PGP, TeleNext, and Foster;[1] (3) PGP and TeleNext had a long-standing master agreement that the parties renewed annually under which TeleNext provided production support on various PGP projects;[2] (4) during the relevant time period, PGP was Grieci's team's only client;[3] (5) Foster testified at his deposition that"[PGP] turned out to be, in fact, TeleNext media";[4] (6) TeleNext wired the $300,000 payment to CBS on behalf of PGP;[5] (7) In his declaration, Foster stated that representatives of PGP told Plaintiff's staff that P & G would be Plaintiff's primary contact, P &G in turn "told OH that it (OH) would also be <u>taking direction from TeleNext</u>" (emphasis added);[6] and (8) "TeleNext services exist to service Procter & Gamble. They have no other client base".[7]

In support of Plaintiff's argument that no agency relationship existed, Plaintiff offers Foster's declaration which includes boilerplate language that there was no discussion that TeleNext was an agent for PGP or P & G and that TeleNext never represented that it had authority to act on behalf of either company. Foster decl.¶ 13. Despite this assertion, Foster also stated in his declaration that "TeleNext attempted to assert [its] active involvement and control in OH's day-to-day operations . . . " and that P & G "told OH that it (OH) would also be taking direction from TeleNext" <u>Id.</u> Foster's assertion that TeleNext never held itself out as having authority to act on behalf of PGP or P & G is thus not only contradicted by his prior deposition testimony, but also within Foster's declaration itself. Such "contradictory, self-serving testimony . . . fails to create a genuine issue of material fact." <u>Hexel Corp. v. Ineos Polymers, Inc.</u>, 681 F.3d 1055, 1064 (9th Cir. 2012) (internal citations omitted). Foster's declaration on this point is insufficient to

---

[1] ECF No. 65 Ex. 11, Grieci dep. p. 39-40.
[2] Grieci dep. p. 40-41.
[3] <u>Id.</u> p. 14.
[4] Foster dep. p. 89.¶¶ 14-16.
[5] No. 75 Ex. 9, Cahill dep. p. 67-68.
[6] ECF No. 72 Ex. 3 Foster decl. ¶13.
[7] Jackson dep. p.50. ¶ 5-7.

create a genuine dispute of material fact as to whether an agency relationship existed between PGP and TeleNext with respect to Operation: Heroes.

The Court finds that Defendants have set forth sufficient undisputed evidence to establish by a preponderance of the evidence that TeleNext was an agent of PGP with respect to Operation: Heroes, and Plaintiff has failed to set forth any evidence to the contrary. Therefore, the Court finds that TeleNext was PGP's agent with respect to Operation: Heroes and the PGP Contract. Because an agent acting within the scope of his principal's interests cannot be liable for interfering with the contracts of its principal, Plaintiff's claim for intentional interference against TeleNext for interference with the PGP Contract will be dismissed. Because no agency relationship existed with respect to TeleNext and CBS, the Court proceeds to analyze Plaintiff's claim for intentional interference by TeleNext with the CBS Contract.

### b. Intentional Interference with the CBS Contract

Plaintiff alleges that TeleNext personnel "were constantly advocating for PGP to breach the contract. They also advocated for PGP, P & G, and [TeleNext] to exert additional influence on the show . . . and conspired to remove Chuck Foster . . . from production." ECF No. 72 p. 9. As evidence of TeleNext's intent, Plaintiff points to a series of emails exchanged between representatives of TeleNext, P & G, and PGP in October and November of 2009, more than three months prior to PGP's alleged breach. Simply put, these e-mails are not the "smoking gun" that Plaintiff's Opposition makes them out to be. In an October 2009 e-mail, Grieci of TeleNext recommends that the three companies "formulate a strategy to direct O/H", place specific milestone dates for production achievements, and internally agree on a "no-go" date if certain deliverables are not met. ECF No. 72 Ex. 5, Grieci e-mail. In a November 9, 2009, e-mail, Grieci indicated that in his opinion, Foster would not be able to deliver the show up to P & G standards in May 2010, but that he would <u>nonetheless continue to do his job as directed</u>. <u>Id.</u> at 4 (emphasis added). The final e-mail cited by Plaintiff was actually written by Pat Gentile, a representative of PGP, and is thus is not evidence of TeleNext's intent. A reasonable jury could not conclude from these e-mails that TeleNext specifically intended to disrupt the CBS Contract.

Plaintiff's claim also fails on the element of actual disruption. Plaintiff has failed to point to "specific facts showing that the actions taken by [TeleNext] directly caused disruption of the [CBS] contract." For example, Plaintiff conclusively argues that TeleNext interfered with the CBS Contract by interfering with Plaintiff's day-to-day operations, but Plaintiff does not cite to any specific facts in the record showing how TeleNext interfered, or how that interference directly resulted in the disruption of the CBS Contract. Likewise, even assuming intent could be shown, Plaintiff has offered no evidence to show that TeleNext actually caused PGP to refuse to deliver the LOC to CBS which in turn caused disruption of the CBS Contract. The undisputed facts show that the final decision not to deliver the note was made by P & G. Additionally, the above e-mails cited by Plaintiff suggest that TeleNext had little if any influence or authority over PGP's failure to deliver the LOC. Despite Grieci's opinion that Foster would not be able to deliver the show as promised, Grieci wrote that he would continue to do his job as directed. ECF No. 72 Ex. 5 p. 4, Grieci e-mail. Moreover, although Grieci suggested a no-go date of no later than Thanksgiving of 2009, PGP continued to make the payments under the PGP Contract as due until February 2010. Id.

Because Plaintiff has failed to establish that TeleNext intended to cause or actually caused disruption of the CBS Contract, Plaintiff's claim for intentional interference against TeleNext for interference with the CBS Contract will be dismissed. Accordingly, Plaintiff's claim for intentional interference with contractual relations (Claim Three) will be dismissed in its entirety.

**2. Intentional Interference with Prospective Economic Advantage**

Because the Court has already held that the parent company privilege applies in this case, P & G cannot, as a matter of law, be liable for intentional interference with Plaintiff's prospective relationship with PGP. Likewise, because the Court has already found that TeleNext was an agent of PGP, TeleNext cannot be liable for interference with Plaintiff's prospective relationship with PGP.

Accordingly, the Court will analyze Plaintiff's claim for intentional interference with respect to CBS and the potential sponsors only.

    **a. Legal Standard**

Under Nevada law, intentional interference with prospective economic advantage requires proof of: (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. Leavitt v. Leisure Sports, Inc., 734 P.2d 1221, 1225 (Nev. 1987). "Privilege can exist when the defendant acts to protect his own interest." Leavitt, 734 P.2d at 1226. Thus, to establish this tort, a plaintiff "must show that the means used to divert the prospective advantage was unlawful, improper, or was not fair and reasonable." Custom Teleconnect, Inc. v. Int'l Tele-Servs., Inc., 254 F. Supp. 2d 1173, 1181 (D. Nev. 2003) (internal citations omitted); Las Vegas-Tonopah-Reno Stage Line, Inc., v. Gray Line Tours of S. Nev., 792 P.2d 386, n. 1 (Nev. 1990) (emphasizing that "[i]mproper or illegal interference is crucial to the establishment of this tort").

### b. Prospective Contractual Relationship

Plaintiff alleges that it had prospective economic relationships with CBS and various sponsors, including American Airlines, Greyhound, and MegaRed Vitamins.[8] For the reasons discussed below, the Court finds that Plaintiff has failed to offer proof that it had prospective relationships with any of the above-listed entities.

Plaintiff argues that it had a prospective relationship with CBS because the CBS contract contains an option for renewal and Foster and a representative of CBS "discussed" making Operation: Heroes an annual production. ECF No. 72 p. 18. However, CBS's decision to exercise its right to renewal was always dependent on a number of factors, including the show airing as scheduled and being a popular and commercial success. Because of these contingencies, Plaintiff did not have a presently expected contractual relationship with CBS by way of the renewal option when Defendants allegedly interfered in April of 2010.

As proof of Plaintiff's prospective relationships with American Airlines, Greyhound and

---

[8] In Plaintiff's response to Defendants' interrogatories, Plaintiff identified numerous additional prospective sponsors, including: Marriott Hotels, Tropicana Las Vegas, and Bain Sills Productions. However, the only three prospective sponsorships that Plaintiff offers any proof to support in its opposition are American Airlines, Greyhound, and MegaRed Vitamins. Accordingly, the Court will analyze Plaintiff's claim only with respect to these three prospective sponsors. ECF No. 72 p. 22

MegaRed, Plaintiff cites Foster's declaration which states that Plaintiff was "able to get very close to finalizing sponsorship agreements with American Airlines, Greyhound, and MegaRed Vitamins." ECF No. 72 p. 11. Plaintiff does not cite to any specific facts in the record to support Mr. Foster's declaration on this point, or to shed light on what "very close" means. The Court finds that Plaintiff has failed to offer sufficient proof that Plaintiff had prospective relationships with American Airlines, Greyhound, MegaRed, or any other sponsor identified by Plaintiff in Plaintiff's response to Defendants' interrogatories.

### c. Lack of Privilege or Justification

Even assuming that Plaintiff could offer proof of these prospective contractual relationships, Defendants knowledge of these relationships, and Defendants intent to harm Plaintiff by disrupting them, Plaintiff's claim for intentional interference with prospective economic advantage also fails because Plaintiff has failed to offer any proof that Defendants' actions were not privileged. Plaintiff has failed to offer evidence that Defendants' actions were unlawful or that they were undertaken for some improper purpose rather than to protect Defendants' economic interests. As discussed previously, P & G, as the parent company of PGP, was privileged to cause PGP to refuse to deliver the LOC to CBS, and there is no evidence that P & G used unlawful means to do so. Likewise, even if TeleNext somehow influenced PGP not to deliver the LOC, its actions were clearly privileged as they were taken in the scope of TeleNext's agency relationship with PGP. Although Plaintiff alleged in its complaint that Defendants contacted potential sponsors and slandered the Operations: Heroes Production and its staff, ECF No. 25 ¶ 14, Plaintiff has failed to produce any evidence that Defendants contacted any third parties and slandered Plaintiff. This is the type of unlawful and improper activity that, if proven, could have supported this claim.

### d. Actual Harm

As a final note, Plaintiff has also failed to show causation. Plaintiff has not offered proof that its prospective relationships with CBS and the named sponsors were actually harmed by Defendants' actions. "[A]ctual harm] is not satisfied when the pleadings indicate that the harm which occurred could just as easily have occurred due to acts other than those of the Defendant." Roche v. Audio Visual Servs. Grp., Inc., 2011 WL 2971034, * 5 (D. Nev. July 20, 2011). In other

words, the Plaintiff must show that he "would have been awarded the contract but for the defendant's interference." Bally Tech., Inc., v. Bus. Intelligence Solutions, 2012 WL 3656498, * 4 (D. Nev. Aug. 23, 2012).

Plaintiff argues that "the key impediment to obtaining [ ] sponsorships was the failure of PGP, at P & G's behest," to provide the contractually mandated public relations support, including public announcement of P & G as a sponsor. Foster decl. ¶15. P & G and TeleNext allegedly further interfered with Plaintiff's ability to secure sponsors by "provid[ing] constant pushback on operational decisions and refus[ing] to participate in press conferences promoting the event." Id. ¶15. While Plaintiff argues that it was unable to secure sponsors in part because P & G refused to allow Plaintiff to identify P & G as a sponsor, representatives from both Greyhound and American Airlines testified that they knew that P & G, PGP, and TeleNext were involved in Operation: Heroes. ECF No. 65 Ex. 26, Palmersheim decl. ¶16; Id. Ex. 30 Plaskett decl ¶ 6. Indeed, a representative of P & G met with a representative of Greyhound in November 2009 to discuss Operations: Heroes sponsorship opportunities. Plaskett decl. ¶ 2.

Additionally, representatives from American Airlines and Greyhound stated in their declarations that the decision not to enter into sponsorship agreements with Plaintiff was based on their own personal interactions with Foster and his repeated failure to provide requested details about the production of the show. Palmersheim decl.¶¶ 6-7, ¶ 16; Plaskett decl. ¶¶ 4-5, ¶ 6. These representatives further stated that PGP, P & G, and TeleNext did not interfere with any prospective relationships between their respective companies and Plaintiff. Id.

Finally, the decisions of American Airlines and Greyhound not to sponsor Operation: Heroes were communicated on March 11, 2010, and April 29, 2010, respectively. Both decisions were thus communicated at least one month after P & G informed Plaintiff that it would not provide the LOC to CBS. Palmersheim decl. ¶16; Plaskett decl. ¶ 5. Thus, both companies continued negotiations with Plaintiff for some time after P & G informed Plaintiff that PGP would not deliver the LOC, and Greyhound continued for almost one month after cancellation of the CBS Agreement. Given these facts, a reasonable jury could not conclude that Defendants actually caused disruption of Plaintiff's prospective sponsorships.

Because Plaintiff has failed to factually support each element for its claim for intentional interference with prospective economic advantage against both P & G and TeleNext, Claim Four will also be dismissed in its entirety.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants, Procter and Gamble Company and TeleNext Media, Inc.'s Motion for Summary Judgment (ECF No. 65) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (ECF No. 74) is **DENIED** as moot.

DATED this 29th day of September, 2015.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**